515 F.2d 29
 UNITED STATES of America, Appellee,
v.
Anthony N. ARMOCIDA a/k/a "Sonny" et al.
Appeal of Alespeo Aldo CONTI, in No. 74-1090.
Appeal of Anthony ARMOCIDA, in No. 74-1146.
Appeal of George JOSEPH, in No. 74-1253.
 Nos. 74-1090, 74-1146 and 74-1253.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 14, 1974.
Decided April 11, 1975.
As Amended April 23, 1975.
 
 James K. O'Malley, Morris, Safier & Makoroff, and John L. Doherty, Thomas A. Livingston, of Livingston, Miller & Haywood, Pittsburgh, Pa., for appellants.
 Reuben H. Wallace, Jr., Crim. Div., Dept. of Justice, Washington, D. C., Peter M. Shannon, Jr., Dept. of Justice, Washington, D. C., Richard L. Thornburgh, U. S. Atty., Carl L. Lo Presti, Pittsburgh Strike Force, Pittsburgh, Pa., for appellee.
 Before VAN DUSEN, HUNTER and GARTH, Circuit Judges.
 Opinion of the Court
 GARTH, Circuit Judge.
 
 
 1
 The appellants, charged with various violations of the federal narcotics and conspiracy statutes, appeal from their convictions and sentences following a jury verdict. Each of them allege numerous individual and common grounds for reversal of their respective convictions, placing particular emphasis on the failure of the district court to suppress evidence obtained through a series of court-ordered electronic surveillances.
 
 I.
 
 2
 On January 26, 1973, a sixteen count indictment charging various narcotics violations was returned against ten individuals, including the three appellants: Anthony Armocida, a/k/a "Sonny", Alespeo Aldo Conti, a/k/a "Spoons", a/k/a "Spooks", a/k/a "The Shoe Salesman", and George Joseph. In essence, the indictment charged the defendants with the importation, possession and distribution of heroin and with conspiracy to import and distribute heroin.
 
 
 3
 After pleading not guilty to the charges on March 2, 1973, Armocida and Conti moved to suppress evidence obtained by wiretaps,[1] asserting a lack of probable cause. Armocida only moved to suppress for failure to minimize the interception of non-relevant conversations. The motions were denied. Thereafter, the appellants (with other co-defendants not appellants here)[2] were jointly tried to a jury in the District Court for the Western District of Pennsylvania. After a nine-week trial, the three appellants were found guilty on various counts of the indictment[3] and sentenced. These appeals followed.
 
 II. Wiretap Violations
 
 4
 Appellants Armocida and Conti contend that the evidence seized during the wiretaps on their telephones should have been suppressed because the only support for the wiretap application was an affidavit which failed to establish probable cause.
 
 
 5
 The federal wire interception statute, 18 U.S.C. §§ 2510-2520 (Title III, Omnibus Crime Control and Safe Streets Act of 1968), requires a wiretap application to show probable cause in three different contexts. The first is that an individual has or is about to commit one of several enumerated offenses, including the importation and distribution of heroin; the second: that particular communications relating to the charged offense will be obtained through the interception; third: the premises where the interception will be made are being used in connection with the charged offense.[4] We have considered the appellants' contentions and have independently examined the relevant affidavits supporting the wiretap application. See United States v. Lampkin, 464 F.2d 1093, 1095 (3d Cir. 1972). Applying the statutory standard[5] of "probability" as distinct from a "prima facie showing", Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), we hold that the application on which the district court's order of September 19, 1972 issued, satisfied the probable cause requirements of the statute.
 
 A. Armocida
 
 6
 Before a warrant may have issued here, § 2518(3)(a) required that there be probable cause that Armocida was engaged in the unlawful importation and distribution of heroin. See 18 U.S.C. §§ 2516, 2518(3)(a). Here, the government's showing of probable cause depends primarily upon information supplied by a confidential informant and upon conversations intercepted on (co-defendant) George Gazal's telephone.
 
 
 7
 Special Agent Greene's affidavit[6] reveals that a confidential informant acquired his information by direct dealings with Armocida in heroin distribution. Section A of the affidavit in part recites: "These two men (Armocida and co-defendant Eugene Gesuale, who was acquitted) asked the informant if he (the informant) could locate a source of heroin." The affidavit also sought to establish the informant's reliability by referring to other instances in which information provided by the same informant had been corroborated by independent investigation.[7]
 
 
 8
 Greene's affidavit, relying as it does on an informant, must be tested by the standards of Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and its progeny. See United States v. Harris,403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); United States v. Singleton, 439 F.2d 381 (3d Cir. 1971). Under Spinelli, two distinct analyses are required to determine if probable cause is established through information provided by an informant. Spinelli requires: first, that the affidavit set forth the " 'underlying circumstances' necessary to enable the magistrate independently to judge of the validity of the informant's conclusion," and second, that the affidavit must reveal the basis of the informant's reliability. 393 U.S. at 413, 89 S.Ct. at 587. Greene's affidavit clearly meets these two requirements. As such, it is adequate to support an independent judgment of probable cause.
 
 
 9
 Supplementing the informant's information, Greene's affidavit recites intercepted conversations between Armocida and Gazal (obtained pursuant to the Gazal wiretap). These conversations reveal the probability that Armocida was familiar with and a participant in the scheme of distributing heroin through Gazal. Thus, the first probable cause requirement of § 2518 is satisfied. See 18 U.S.C. § 2518(3)(a).
 
 
 10
 Next, Armocida urges that even if the affidavit showed probable cause of the existence of the illegal activity itself, it nonetheless was deficient in that it failed to establish the other two elements of probable cause required in 18 U.S.C. § 2518(3)(b) and (d): (1) that the communication relative to the offense would be obtainable through monitoring as required by § 2518(3)(b), and (2) that the premises (where the interception took place) were being used in connection with the illegal activity, § 2518(3)(d). See supra note 4.
 
 
 11
 We find no merit to this argument. The conversations intercepted by the wiretap on Gazal's telephone and set forth in the Greene affidavit, amply demonstrate that Armocida utilized his telephone from his premises to communicate with other alleged conspirators in furtherance of the conspiracy to distribute heroin.
 
 
 12
 Armocida also argues that the affidavit was statutorily insufficient as it alleged that he was violating 21 U.S.C. §§ 952 and960(a)(1)[8] by the importation of heroin without detailing the offense with sufficient particularity as required by 18 U.S.C. § 2518(1)(b)(i).[9] However, in our view the "particularity" requirements of § 2518(1)(b)(i) are not to be given an overly narrow reading, but are rather to be interpreted in a common sense and pragmatic fashion. See United States v. Tortorello,480 F.2d 764, 780-81 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). What is required in the application is the identification of, and details related to, a specified crime or a specified series of related crimes. Here, interception was sought of conversations relating to a pattern of criminal conduct (from importation to ultimate distribution), within which violations of §§ 952 and 960(a)(1) were alleged. Although the affidavit makes limited reference to §§ 952 and 960(a)(1), it nevertheless describes the pattern of criminal conduct and the nature of offenses sought to be investigated through the use of wiretaps. Those offenses are sufficiently identified and particularized so as to include "importation", thereby satisfying the requirements of the statute. See United States v. Tortorello, 480 F.2d at 778-81; cf. Steele v. United States, 267 U.S. 498, 504, 45 S.Ct. 414, 69 L.Ed. 757 (1925).
 
 
 13
 We also reject Armocida's final contention that the evidence from the wiretaps should be suppressed because the affidavit supporting the application failed to establish the need for a wiretap. As required by statute, 18 U.S.C. § 2518(3) (c), the issuing district court judge found on the basis of the wiretap application that "normal investigative procedures have been tried and reasonably appear unlikely to succeed, if continued."
 
 
 14
 The statutory requirement that "normal investigative procedures" be first exhausted, must be reviewed in a "practical and common sense fashion":
 
 
 15
 "Subparagraph (c) requires a full and complete statement as to whether or not normal investigative procedures have been tried and have failed or why these are unlikely to succeed if tried, or to be too dangerous. . . . The judgment would involve a consideration of all the facts and circumstances. Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. See Giancana v. United States, 352 F.2d 921 (7th) certiorari denied, 382 U.S. 959, 86 S.Ct. 437, 15 L.Ed.2d 362 (1965); New York v. Saperstein, 2 N.Y.2d 210, 159 N.Y.S.2d 160, 140 N.E.2d 252 (1957). What the provision envisions is that the showing be tested in a practical and commonsense fashion. Compare United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)."
 
 
 16
 1968 U.S.Code Cong. & Admin.News at p. 2190 (emphasis supplied). See United States v. James, 161 U.S.App.D.C. 88, 494 F.2d 1007, 1015-16 (1974), cert. denied, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). To support a finding that normal investigative procedures are unlikely to be successful, we interpret the congressional directions as only requiring that there exist a factual predicate in the affidavit. That factual predicate is satisfied by the Greene affidavit.
 
 
 17
 The Greene affidavit reveals a history of physical surveillance; utilization of informants; undercover agents; and other wiretap interceptions. All of these failed to determine the scope of the conspiracy and to identify the participants. Having failed through these techniques, Greene's affidavit then recites that: (1) the informant would not testify; (2) surveillance was too easily noticeable and could jeopardize the investigation (surveillance, as noted, had already failed); (3) a search warrant was unlikely to reveal either the identities of those believed involved in the conspiracy to distribute heroin or the source of the heroin.[10]
 
 
 18
 When the wiretap application was made, the government's objective was to ascertain the scope of the alleged narcotics conspiracy and to identify the participants. As recited in Greene's affidavit, the normal investigative techniques utilized were ineffective other than in identifying Gazal as the "street-level" distributor. Affidavit of James P. Greene, supra note 6, at 12. Although the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned. See United States v. Focarile, 340 F.Supp. 1033, 1042-44 (D.Md.), aff'd sub nom., United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), rev'd on other grounds, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). We have held that the statutory burden on the government is not great in showing compliance with § 2518(3)(c). Accord United States v. Bobo, 477 F.2d 974, 982-83 (4th Cir. 1973); United States v. Lanza, 356 F.Supp. 27, 30 (M.D.Fla.1973). As stated, the government need not prove to a certainty that normal investigative techniques will not succeed, but rather need only show that such techniques "reasonably appear to be unlikely to succeed if tried." Cf. Beck v. Ohio, supra. By this standard, Greene's affidavit is clearly sufficient to support the finding made by the court.
 
 B. Conti
 
 19
 Appellant Conti also challenges the court order authorizing the wiretap on his telephone, claiming the absence of probable cause. To establish probable cause for the wiretap of Conti's telephone, Greene's affidavit provided, in part, verbatim excerpts of intercepted conversations involving Gazal, Conti and Armocida. These intercepts were obtained pursuant to a judicially authorized wiretap on Gazal's telephone. Of the four conversations found in the affidavit, two were between Conti and Gazal. In the first intercepted telephone call, Gazal asked Conti if he (Conti) had seen "that fellow." Conti replied, "No, no, I was waiting maybe I'll give him a call. I was waiting, you know, I figured he'd give me a call."[11]
 
 
 20
 In the second reported telephone involving Conti (a call intercepted two days later), Conti told Gazal that he talked to "him" and "he" said "he" would be up on Sunday. Gazal told Conti that "we're out of tires."[12] Conti: "I know."[13]
 
 
 21
 In the time between these two telephone calls, two other telephone calls occurred, both of which appear in the affidavit. The first of these latter calls was placed from Gazal to Armocida sixteen minutes after the first Gazal-Conti conversation. See n. 11, supra. Gazal told Armocida that he, Gazal, had talked to the "shoe salesman" and that the "shoe salesman" would talk to "that guy" later.[14] Later that same day but prior to the second Gazal-Conti conversation, see n. 13, supra, Armocida told Gazal that he, Armocida, had talked to the "shoe salesman" and that "the guy" had told the salesman that there was a delay and that he (the guy) would "stop over his house Sunday."[15]
 
 
 22
 We believe the affidavit was sufficient to establish a showing of probable cause as to Conti, even though the two conversations in which Conti was a participant may not suffice, when standing alone, to justify the belief that Conti was engaging in proscribed conduct. Both district court judges,[16] (one by issuing the interception order and the other by denying the motion to suppress evidence), were required to test the affidavit "in a commonsense and realistic fashion." See United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Both found the affidavit sufficient in establishing probable cause in the three different areas required by § 2518. We agree.
 
 
 23
 First, the telephone conversations reflected in the affidavit established that Conti was on familiar terms with both Armocida and Gazal, and that the three were involved in some form of ongoing activity in which Conti was the intermediary between Armocida and Gazal and an unidentified "fourth party". Second, Conti was to represent the interests of Gazal and Armocida (two individuals believed to be trafficking in drugs) in dealings with the "fourth party". Third, Conti participated in a conversation with Gazal in which a code word was utilized ("tires"). The context of the conversation in which the code word was used suggested that Conti was to do something to remedy the shortage of "tires."16a
 
 
 24
 Accordingly, we conclude that the affidavit as a whole reveals a sequential course of conduct involving illegal activity and provides probable cause to believe Conti was a participant. See, e. g., United States v. Kleve,465 F.2d 187, 191-93 (8th Cir. 1972); Hernandez v. United States, 353 F.2d 624, 627 (9th Cir. 1965), cert. denied, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966). If the apparent facts set out were such that a reasonable man would be led to believe that Conti was using his telephone in conspiring to distribute narcotics, that is enough. See Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); United States v. James, supra. The affidavit here meets this test.
 
 
 25
 Conti also argues that the district court erred in admitting into evidence the conversations intercepted on Conti's telephone because the affidavit supporting the government's application for a wiretap contained a material misrepresentation of fact. Conti's argument "straddles" the Greene affidavit and Greene's trial testimony. Conti first observes that in the affidavit's wiretap portion (based on Gazal's intercept), Greene concluded that Conti was the participant . . . "to be contacted by a source of heroin on 'Sunday.' " Despite this, the "Physical Surveillance" section of the affidavit reveals no surveillance of Conti on the following Sunday. The argument then proceeds to Greene's testimony at trial. Greene testified (Tr. 4516-17) that in fact a surveillance of Conti did occur as a result of the telephone intercepts, but that no one was then meeting with Conti on "Sunday". Hence concludes Conti, with knowledge of a surveillance and with knowledge of a professed "meet" that never occurred, Greene executed an unfair, misleading affidavit, omitting crucial information that could have affected the issuance of a wiretap order on Conti's telephone.
 
 
 26
 As previously discussed, the affidavit in support of the wiretap application was sufficient on its face to establish probable cause. Yet even a facially sufficient affidavit, if it contains misrepresentations of fact, may lead to invalidating an order based upon the affidavit. See, e. g., United States v. Hunt, 496 F.2d 888 (5th Cir. 1974); United States v. Carmichael, 489 F.2d 893 (7th Cir. 1973) (en banc). Although those courts which have addressed the issue of misrepresentation of facts contained in a government agent's affidavit have reviewed false statements set forth in the affidavit, rather than, as here, the omission of facts from an affidavit, we believe the standards they have established apply to the case at hand.
 
 
 27
 To this date two standards have been developed by the courts of appeal which have considered the issue of misrepresentation. The standard set forth by the Seventh Circuit, United States v. Carmichael, 489 F.2d at 988-89, and adopted by the Eighth Circuit, United States v. Marihart, 492 F.2d 897, 900 (1974), cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974), is that a defendant is entitled to a hearing to challenge a facially sufficient affidavit when an initial showing is made either: (1) that the government agent intentionally misrepresented a fact, whether or not material; or (2) that the government agent was reckless and misrepresented a material fact. Evidence obtained from court orders based on such misrepresentations would be suppressed if, after the hearing, the trial court found that the government agent had either recklessly or intentionally misrepresented facts.[17]
 
 
 28
 The Fifth Circuit, United States v. Thomas, 489 F.2d 664 (1973), has adopted a slightly different test, holding that an affidavit is invalid if (1) the government agent intentionally misrepresented a fact, whether or not material (this is the same test as the first of the Seventh Circuit's test); or (2) the error was non-intentional, but is material to the establishment of probable cause.
 
 
 29
 In this appeal, we believe it unnecessary to decide which of the two standards should be adopted, for under either standard the validity of the affidavit, and consequently the validity of the wiretap order, must be upheld. Considering the affidavit as a whole, the omission that Conti was under surveillance and that he did not meet with anyone on "Sunday" was not material to a showing of probable cause, and thereby satisfied the second test of either standard. Greene never stated that a Sunday meeting occurred. Rather, after analyzing certain information, Greene concluded that Conti "is the man most likely in direct contact with a source of heroin" and that "Armocida and Gazal were aware that Conti was to be contacted by a source of heroin on 'Sunday'."[18]
 
 
 30
 Three obvious considerations lead us to reject Conti's argument. First, Greene's "conclusion" is not a fact within the comprehension of the standards against which it must be tested. Second, the manner in which "Sunday" is set forth in the affidavit, makes it readily apparent that no particular Sunday or other day was intended by use of the word Sunday within quotation marks. Third, the only reference to "Sunday" was in the context of Greene's describing not his own, but rather someone else's (i. e. Armocida and Gazal) knowledge of Conti's "Sunday" meeting. Consequently, the failure of the affidavit to recite an uneventful surveillance of Conti on the Sunday following the intercepted calls which gave rise to Greene's "conclusion", is neither material nor would it prove exculpatory as to Conti. We recognize that the Conti affidavit was predicated upon intercepts of Gazal's telephone and thus whatever arrangements Conti may actually have made (or changed over his own telephone), the recitals in the affidavit nevertheless demonstrate probability that Conti was at the focal point of the arrangements.
 
 
 31
 As to the first test of either the Seventh or Fifth Circuit view (i. e. intentional misrepresentation), Conti has neither alleged nor made any showing that Greene intentionally omitted from his affidavit reference to the surveillance and to the failure of Conti "to be contacted." We are satisfied that with respect to these contentions no basis exists to invalidate the Greene affidavit or the order based upon it.
 
 III. Minimization
 
 32
 Appellant Armocida[19] urges that the wiretap must be suppressed in its entirety (1) because the government failed to conduct the wiretap in compliance with 18 U.S.C. § 2518(5)[20] so as to minimize the interception of communications not subject to lawful interception, and (2) because the government failed to comply with the district court's allegedly more restrictive order of minimization. After review of the evidence taken at the suppression hearing, we agree with the district court judge that there was no violation of the minimization requirement of the statute or of the court.
 
 
 33
 To determine if the wiretaps were improperly conducted, we must first examine what the statute requires. Section 2518(5) does not prohibit the interception of all non-pertinent conversations; rather it requires the government to conduct the wiretap so as to minimize the interception of such calls. The minimization standard is one of the reasonableness of a particular interception, which is to be ascertained on a case-by-case analysis. Accord United States v. Quintana, 508 F.2d 867 (7th Cir. 1975); United States v. James, 494 F.2d at 1018. See S.Rep.No.1097, 90th Cong., 2d Sess. 101, 1968 U.S.Code Cong. & Admin.News at p. 2190. As stated by the Second Circuit Court of Appeals, the minimization requirement is satisfied if
 
 
 34
 " on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion."
 
 
 35
 United States v. Tortorello, 480 F.2d 764, 784 (2d Cir.), cert. denied, 414 U.S. 886, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) (emphasis supplied). Thus in certain factual circumstances the interception of all conversations may be found violative of the minimization requirement, e. g., United States v. King, 335 F.Supp. 523, 540 (S.D.Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973), cert. denied, 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 (1973), yet justified in other factual surroundings, e. g., United States v. Quintana, supra; United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).
 
 
 36
 On this appeal, we are not faced with allegations that the minimization requirements were flagrantly violated, as when no attempt has even been made to minimize the interception of "innocent" calls. Compare United States v. George, 465 F.2d 772 (6th Cir. 1972); United States v. Scott, 331 F.Supp. 233 (D.D.C.1971). Rather here, appellant Armocida, while acknowledging minimization attempts by the government, argues that the statute and order requiring minimization were violated because the minimization methods used by the government were inadequate. Accordingly, our inquiry is directed to whether or not under the circumstances presented here the intercept procedures were conducted so as to reduce to the smallest practicable number the interception of innocent, i. e. "personal", calls. In an inquiry of this nature, the government has the burden of proving that its conduct avoided unnecessary intrusion and resulted in " . . . no greater invasion of privacy . . . than (was) necessary under the circumstances." Berger v. New York, 388 U.S. 41, 57, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967). See United States v. Falcone, 364 F.Supp. 877 (D.N.J.1973), aff'd, 505 F.2d 478 (3d Cir. 1974).
 
 
 37
 Although statistical details of wire intercepts are by no means determinative on the issue of minimization, see, e. g., United States v. Bynum, 485 F.2d 490, 502 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), they do provide a starting point for our analysis of the government's conduct in monitoring conversations. See, e. g., United States v. Focarile, 340 F.Supp. 1033, 1049-50 (D.Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), rev'd on other grounds, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Here, the government's evidence shows that on the Conti wiretap:[21]
 
 
 38
 On the Armocida wiretap, the government's evidence shows:
 
 
 39
 Without more, these statistics indicate to us that at the least a substantial effort was made to limit the number of interceptions and to minimize the interception of non-pertinent, "innocent" calls. See, e. g., United States v. Curreri, 363 F.Supp. 430, 436-37 (D.Md.1973). However, the appellants argue that the government's statistics must be viewed with some skepticism and, if so viewed, support a conclusion that the government failed to comply with minimization requirements. The argument of "overtap" is directed here to the monitoring, in their entirety, of those conversations alleged to be "personal" and therefore not subject to legal interception.
 
 
 40
 In particular, appellant Armocida contends that 77 of the conversations intercepted in full should have been terminated as an analysis of their content now reveals that the 77 intercepts were entirely personal in nature. We do not agree. The mere assertion, even if found true, that certain non-pertinent conversations were intercepted in full does not necessarily render the surveillance violative of the minimization requirements of the statute. As we have previously stated, in circumstances such as those found here, where a complete disregard of the statute's requirements is not charged, compliance with the minimization requirement is to be ascertained by determining whether a good faith effort to minimize was attempted. See United States v. Manfredi, 488 F.2d 588, 600 (2d Cir. 1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); United States v. Bynum, 485 F.2d at 500-01; United States v. Curreri, 363 F.Supp. at 437.
 
 
 41
 In making this determination we look to three aspects of the surveillance. These three factors, set forth below, are crucial and must be considered in any review of minimization. However, we do not imply that a reviewing court should not consider other factors in cases presenting different circumstances. The government's compliance with minimization requirements necessarily must be determined through case-by-case review. Such an analysis may require consideration of additional factors. See, e. g., United States v. James, supra ; United States v. Bynum, 485 F.2d at 500-02; United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971). The facts present here, however, do not oblige us to consider aspects of minimization other than those which we have set forth.
 
 
 42
 First, we are concerned with the nature and scope of the criminal enterprise under investigation. We recognize that where the criminal enterprise under investigation is a large-scale conspiracy, it may be necessary for the government to intercept more conversations than where the investigation is of a more limited criminal undertaking. This is especially so where, as here, the judicially approved wiretap is designed to identify other participants in the conspiracy and to determine the scope of the conspiracy. See United States v. Quintana, 508 F.2d at 874; United States v. James, 494 F.2d at 1019. Moreover, somewhat greater latitude may be allowed where conspirators converse in a colloquial code, thereby creating superficially innocent conversations that are actually relevant to the investigation. Such guarded use of language has frequently been noted to exist in cases involving narcotics conspiracies, e. g., United States v. James, 494 F.2d at 1019; United States v. Sisca, 361 F.Supp. 735, 744 (S.D.N.Y.1973), and indeed occurred here.[22]
 
 
 43
 Second, we must consider the government's reasonable expectation as to the character of, and the parties to, the conversations. As stated by the Court of Appeals for the District of Columbia:
 
 
 44
 If at the time of the initiation of the wiretap the government knows those persons who are suspected of the criminal offense, it can tailor its minimization efforts to avoid monitoring incoming or outgoing calls involving other persons; similarly, if the government knows during what time of the day the telephone will be used for criminal activity, it can avoid intercepting calls at other times. These considerations affect the initial minimization tactics employed by the government, but agents may expand or contract their interception policy as the wiretap continues . . ..
 
 
 45
 United States v. James, 494 F.2d at 1020.
 
 
 46
 Finally, we are concerned here with the degree of judicial supervision by the authorizing judge. The statute permits a district judge, once he has authorized a wiretap, to continue supervising the operation of the interception by requiring reports from the government. 18 U.S.C. § 2518(6).[23] Where the authorizing judge has required and reviewed such reports at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted. See, e. g., United States v. James, 494 F.2d at 1021; United States v. Bynum, 485 F.2d at 501; United States v. Cox, 462 F.2d at 1301.
 
 
 47
 In view of the above factors, we believe the monitoring agents exercised their discretion in a good faith effort to minimize, even though it now appears by hindsight that a number of intercepted calls could have been terminated at an earlier time. Despite this, our examination of the intercepts, the record and the circumstances, reveals compliance with the statute. We do not believe that electronic surveillance can be conducted with the total elimination of innocent conversations. Here, the monitoring agents were fully aware of the authorizing judge's instructions to terminate non-pertinent conversations. Yet even if so instructed, agents monitoring an intercept cannot reasonably be expected to distinguish in advance those calls which first appear innocent but which later develop into conversations involving criminal activities.
 
 
 48
 Indeed, of the 77 "personal" conversations which were fully intercepted and which are now challenged by Armocida, many were completed in less than two minutes. Testimony revealed that it normally required one-and-one-half minutes (which included dialing time, greetings and identification of parties) for the monitoring agent to register the call and recognize its eventual direction and relevancy to the investigation. Depending upon the character and content of the conversation, it may take virtually that amount of time before a termination could be effected, even if using all reasonable efforts. (Transcript of Pretrial Hearing of August 14, 1973 at 71-72). We cannot say, therefore, that a full interception of a one-and-one-half minute to two minute conversation violates the minimization requirements. We thus eliminate those brief conversations from our consideration. Accord United States v. Bynum, 485 F.2d at 500. Considering the remaining conversations in view of the wiretap circumstances the scope and purpose of the wiretap, the degree of judicial supervision, the agents' expectations of the conversations and the record as a whole we also find that as to these compliance was had with minimization requirements.
 
 
 49
 As we find that the government has made a prima facie showing of reasonable effort in minimizing the interception of "innocent" conversation, the burden thus shifts to the defendant to show more effective alternative procedures for minimization which nevertheless would permit the government to achieve its objectives. See United States v. Quintana, supra ; United States v. Manfredi, 488 F.2d at 599-600. The defendant here has suggested no such feasible alternatives.
 
 
 50
 Armocida also asserts that even if the statutory minimization requirements were met, the government nonetheless violated the more restrictive minimization requirements established by the district judge in authorizing the wiretaps. Although Armocida is correct in noting that in authorizing the wiretaps the district judge orally instructed the government to minimize interceptions using language more restrictive, (if not internally inconsistent), than that of the statute,[24] we need not decide if an authorizing judge can establish minimization standards more strict than those of the statute and, if so, whether those stricter standards were violated here. The narrow language utilized by the district judge at the ex parte hearing on the government's application did not appear in the written authorization order nor did the authorization order incorporate whatever oral instructions were given. The authorization orders for the wiretaps required only that the interception of each telephone:
 
 
 51
 " . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18 of the United States Code. . . ."
 
 
 52
 This written order was binding upon the government to the exclusion of any prior inconsistent direction. The wording of the authorization order did no more than to compel compliance with the statutory minimization requirements a standard which we hold has been met by the government's conduct.
 
 IV. Trial Errors
 A. Sufficiency of the Evidence
 
 53
 Appellant George Joseph argues that there is insufficient evidence to support his conviction under Count I for conspiracy to distribute heroin. Viewing the evidence in a light most favorable to the government, United States v. Pratt, 429 F.2d 690, 691 (3d Cir. 1970), we are satisfied that the evidence was sufficient to support a jury verdict of guilty. In part, the jury had before it evidence of Joseph's meetings and calls to Conti, one of which informed Conti that "that guy24a that won that game, he's here", (Tr. 1312-13), as well as evidence of Joseph's meeting with Elias Zeaiter, recently arrived from Lebanon, and Joseph's removal from Zeaiter's hotel of Zeaiter's suitcase, which allegedly contained heroin. (Tr. 1276-85). This formed a sufficient factual predicate upon which a jury could find Joseph to have participated in a single conspiratorial enterprise to distribute heroin. E. g., United States v. Bynum, 485 F.2d at 495-97.
 
 B. Severance and Mistrial
 
 54
 Joseph also urges that the district court erred in denying his pretrial motion for severance and his later motion for a mistrial. Joseph sought a severance claiming that a trial of ten defendants under a 16 count indictment was too complex for a jury to identify the respective charges and evidence. Cf. United States v. Branker, 395 F.2d 881, 888 (2d Cir. 1968), cert. denied, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969). Joseph's motion for severance was addressed to the discretion of the district court and, as such, the trial judge's disposition will not be disturbed absent a clear showing that his exercise of discretion was abused. United States v. Somers, 496 F.2d 723, 730 (3d Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). The mere allegations of prejudice raised here do not suffice to satisfy Joseph's heavy burden. Somers, supra.
 
 
 55
 Joseph's motion for a mistrial was based on the contention that certain statements were erroneously admitted into evidence because they were hearsay. We hold that all of the statements were properly received into evidence, being admissible as non-hearsay out of court statements, e. g., Dutton v. Evans, 400 U.S. 74, 88, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (Opinion of Stewart, J.), statements of a co-conspirator, e. g., Anderson v. United States, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1973), or statements not objected to when introduced. (Tr. 1751-52).
 
 
 56
 Accordingly, we will not disturb the rulings of the district court denying motions for severance and mistrial.
 
 C. Co-conspirator Testimony
 
 57
 One hearsay objection raised by Joseph, however, requires closer consideration. Joseph contends that the district court committed prejudicial error as to him when it admitted the testimony of Alvin Clark relating to out of court statements made by Conti. Clark's testimony was that on the morning after he was arrested, he met in jail with co-defendants Conti and Joseph. Clark testified that their ensuing discussion focused on the identity of the government's informant in the conspiracy; Clark and Joseph suspected Gazal as the informant but Conti disagreed. Conti stated to Clark, according to Clark's testimony, that "Gazal did not know everybody," because "he (Conti) got his orders from (Joseph), and Gazal got his orders from (Conti)." (Tr. 4029).
 
 
 58
 Conti's statement was admitted into evidence through Clark's testimony under the doctrine that it was the declaration of one conspirator which may be used against another conspirator. See Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 1352 (1953). Joseph challenges this hearsay-conspiracy exception on the grounds that the declaration, made after all the appellants had been arrested (October 6, 1972), was not made while the conspiracy charged was still in progress.[25] The government disputes the date of arrest as being the date on which the conspiracy charged ended and contends that, as alleged in the indictment, the conspiracy continued until January 26, 1973. In support of the conspiracy's continuation, the government points to Clark's testimony that while he (Clark) was in jail, Conti indicated that the heroin distribution would resume upon the defendants' release on bail. (Tr. 4030-31). This, the government urges, was evidence of a single conspiracy progressing unabated, rather than evidence that a second, more discrete conspiracy was beginning.
 
 
 59
 The time when a continuing conspiracy terminates depends upon the particular facts and purposes of the conspiracy. An unlawful conspiracy is presumed to continue until its objective or purpose is achieved. See United States v. Corallo, 413 F.2d 1306, 1319-20 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969); United States v. Wechsler,392 F.2d 344, 347-48 (4th Cir.), cert. denied, 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968). Where that purpose is the distribution of heroin, it does not necessarily become an unrealized end upon the arrest of co-conspirators. See, e. g., United States v. Agueci, 310 F.2d 817, 838-39 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Under the circumstances of this case, we believe there was sufficient evidence that the conspiracy did not terminate upon the appellants' arrest. We therefore reject Joseph's argument that, as a matter of law, this conspiracy ended upon the arrest of all defendants.
 
 D. Accomplice Testimony
 
 60
 Appellants contend that the trial court erred when it instructed the jury it could convict on the uncorroborated testimony of an accomplice, but failed to instruct the jury that it could return a verdict of acquittal on the basis of the same testimony. The government replies that the appellants, by failure to object to the instruction on accomplice testimony, cannot now raise this objection, see Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); and that even if there had been a timely objection, the error, if any, was harmless.
 
 
 61
 We believe that the appellants properly preserved this issue for appeal. See Fed.R.Crim.P. 30; Tr. at 5710-11. We also believe the challenged instruction[26] was erroneous, see Cool v. United States, 409 U.S. 100, 103 n. 4, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972), but harmless. See Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). The trial court should have properly instructed the jury that on the basis of accomplice testimony it could either convict or acquit.
 
 
 62
 However, unlike Cool, 409 U.S. at 103 n. 4, in this case the erroneous instruction would not require reversal of the convictions. Here, the instruction, though erroneous, was harmless when considered in the light of the minimal evidentiary role played by accomplice testimony and in the context of the entire charge. In Cool, the accomplice testimony controlled the outcome of the trial and was completely exculpatory as to the defendant. Hence, an inculpatory accomplice charge under such circumstances could not be deemed harmless. Here, however, it can justifiably be said that the accomplice testimony did not control the outcome of the trial. Nor did the erroneous instruction infect the trial or the jury deliberations to such a degree as to violate due process. See Cupp v. Naughten, 414 U.S. at 147, 94 S.Ct. 396. Moreover, our overview of the evidence in this case reveals that the verdict was not likely to be determined by the accomplice testimony and that consequently failure to give the "acquittal" segment of the accomplice instruction could not mislead the jury or "turn the scale" against the appellants. Compare Cool v. United States, 409 U.S. at 103 n. 4, 93 S.Ct. 354, with United States v. Hudson, 496 F.2d 698 (5th Cir. 1974).
 
 E. Prejudicial Newspaper Publicity
 
 63
 At the beginning of the sixth week of trial, a Beaver County Pennsylvania newspaper carried an account of a suppression hearing which had been held outside the presence of the jury. Certain marked currency seized from the residence of a co-defendant (Hairston) was suppressed by the district court. The appellants moved to poll the jury, but the district judge, after reading the two published articles, denied the motion. The grounds upon which the denial was based were: (1) none of the jurors, according to the official jury list, resided in Beaver County;[27] (2) after a prior incident involving newspaper reports, the jury had been instructed not to read newspaper accounts (Tr. 1595); and (3) the court feared calling attention to the articles, (thereby emphasizing their content) none of which had appeared in any other newspaper. See Tr. 3771-73; United States v. D'Andrea, 495 F.2d 1170, 1173 n. 8 (3d Cir.), cert. denied, 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974).
 
 
 64
 While we believe that better practice would require the polling of the jury to ascertain if any member had read the newspaper accounts, we cannot say that the district judge abused his discretion under all the circumstances. See United States v. Manning, 440 F.2d 1105, 1112 (5th Cir.), cert. denied, 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971). The publicity here was not so fundamentally prejudicial as to result in actual prejudice occurring as a matter of law. It is significant that the very defendant (Hairston), the subject of the articles, was acquitted on both conspiracy counts. Even assuming, arguendo, that one or more jurors had read the articles, large discretion would remain in the trial judge in ruling on the issue of prejudice. A new trial should be ordered only when substantial prejudice has occurred. E. g., United States v. D'Andrea, 495 F.2d at 1172 n.5; cf. United States ex rel. Doggett v. Yeager, 472 F.2d 229, 239 (3d Cir. 1973). Our examination of the proceedings involving the newspaper articles indicates that in these circumstances substantial prejudice to the appellants could not have resulted from the articles themselves, especially in view of the improbability that the jurors had been exposed to the media accounts. We refrain from finding reversible error upon the mere speculation of prejudice. See Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Gordon v. United States, 438 F.2d 858, 873-74 (5th Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971).
 
 V.
 
 65
 We have carefully examined the other specifications of error, including the district court's denial of a motion to depose a fugitive co-conspirator, the district court's ruling upholding the sufficiency of the government's response to a bill of particulars and the contentions that the verdict on Counts I and II were inconsistent, and find them to be without merit.
 
 
 66
 The judgments of conviction will be affirmed.
 
 
 
 [1]
 Pursuant to the government's investigation and upon the government's applications to the District Court for the Western District of Pennsylvania, the government conducted wiretaps of the telephone communications of the appellants and their co-defendants. One wiretap was authorized on August 30, 1972 and provided for the interception of communications over the telephone used by co-defendant George Gazal. Judicial authorization for this wiretap terminated on September 12, 1972. On September 19, 1972, two additional wiretaps were authorized on the respective telephones of appellants Armocida and Conti. These wiretaps terminated on October 6, 1972. As appellants Armocida and Conti are each a party "against whom the interception was directed," they each have standing as an "aggrieved person" to challenge the admissibility of evidence seized as a result of the wiretaps. See 18 U.S.C. §§ 2510(11), 2518(10)(a). As co-defendant Joseph was never intercepted over the Armocida and Gazal wiretaps, he has no standing to challenge the admissibility of evidence seized as a result of those wiretaps. See 18 U.S.C. §§ 2510(11), 2518(10)(a); Alderman v. United States, 394 U.S. 165, 175 n. 9, 176, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Although Joseph's conversations were intercepted over the Conti wiretap, we read his appeal as not challenging the admissibility of wiretap evidence against him. In any event, even if his appeal were read to challenge wiretap evidence, Joseph would be entitled to no greater relief than that accorded Conti. As we hold Conti's probable cause argument is without merit, see infra at 40, a similar challenge raised by Joseph would necessarily fail
 
 
 [2]
 One co-defendant, Majeed Mafoud, was indicted but not brought to trial as he remained a fugitive throughout the trial proceedings
 
 
 [3]
 All three appellants were convicted of conspiring to distribute heroin (Count 1) and were acquitted on the charge of conspiracy to import heroin (Count 2). Appellant Armocida was also convicted on one count of distribution of heroin (Count 5), one count of possession of heroin with intent to distribute (Count 6), and two counts of using a telephone to facilitate distribution (Counts 14 and 15). Appellant Conti was also convicted on one count of distribution (Count 9) and one count of using a telephone to facilitate the distribution of heroin (Count 14)
 
 
 [4]
 18 U.S.C. § 2518(3)(a), (b) and (d) provides:
 Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that
 (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
 (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
 (d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.
 
 
 [5]
 See United States v. Falcone, 505 F.2d 478, 481 (3d Cir. 1974); United States v. Cafero, 473 F.2d 489, 493 n. 2 (3d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974)
 
 
 [6]
 Affidavit of James P. Greene (Special Agent) at 4, dated September 19, 1972
 
 
 [7]
 Id., Exhibit I to the September 19, 1972 affidavit at 4-6
 
 
 [8]
 In pertinent part, 21 U.S.C. § 952 provides:
 (a) It shall be unlawful to import . . . any controlled substance . . . or any narcotic drug . . .
 (b) . . . or to import . . . any nonnarcotic controlled substance . . . unless (it)
 (1) is imported for medical, scientific, or other legitimate uses . . . .
 Title 21 U.S.C. § 960(a)(1) in turn provides:
 § 960. Prohibited Acts A Unlawful Acts
 (a) Any person who
 (1) contrary to section 952 . . . knowingly or intentionally imports . . . a controlled substance . . . shall be punished as provided in . . . this section. . . .
 
 
 [9]
 Section 2518(1)(b)(i) requires that:
 (1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
 (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed . . . . (emphasis supplied).
 
 
 [10]
 Affidavit of James P. Greene, supra note 6, at 12
 
 
 [11]
 An excerpt of the conversation was transcribed as follows:
 UNIDENTIFIED MALE: Hello.
 GAZAL: Hello.
 UNIDENTIFIED MALE: Hello.
 GAZAL: Is Aldo home?
 UNIDENTIFIED MALE: Well, I have to find out. Let's see.
 ALDO (Conti): Hello.
 GAZAL: Aldo?
 ALDO: Yeah.
 GAZAL: Were you sleeping?
 ALDO: No I was working outside.
 GAZAL: Oh, did you see that fellow?
 ALDO: No, no, I was waiting maybe I'll give him a call. I was waiting, you know, I figured he'd give me a call.
 GAZAL: Oh, okay, give him a call.
 ALDO: Yeah, and ah, maybe I'll talk to you later.
 GAZAL: Okay.
 ALDO: Alright.
 GAZAL: Okay.
 ALDO: Right.
 Affidavit of James P. Greene, supra note 6, at 6.
 
 
 [12]
 A number of courts have recognized that narcotics conspiracies present special problems to investigating agencies because of the heavy reliance upon codes to disguise references to narcotics. See, e. g., United States v. James, 494 F.2d at 1019-20; United States v. Bynum, 485 F.2d 490, 501 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). Here too, the participants resorted to use of codes. See, e. g., infra n. 13. In the transactions between the government's undercover agent (Dreisbach) and Gazal, references to both heroin and quinine (an ingredient used in "cutting" heroin) were consistently coded to disguise conversations that would otherwise clearly reveal narcotics trafficking
 
 
 [13]
 An excerpt of this conversation, occurring on Friday, September 8, 1972, was transcribed as follows:
 ALDO (Conti): I called. I talked to him.
 GAZAL: We're out of tires.
 ALDO: Huh?
 GAZAL: We don't have no tires.
 ALDO: I know.
 GAZAL: Huh.
 ALDO: Well let me see said he'd be up Sunday.
 GAZAL: Why don't you call him tonight. Meet him tonight. He could tell you the same story tonight.
 ALDO: Yea, I know it.
 GAZAL: And find out what's what.
 ALDO: Yea.
 GAZAL: Why does he have to wait till Sunday to tell you a story.
 ALDO: Yea, alright, I'll call him in a little while.
 GAZAL: Yea, tell him you want to see him and then he can explain to you what's wrong.
 ALDO: Don't worry OK.
 Affidavit of James P. Greene, supra note 6, at 8.
 
 
 [14]
 An excerpt of the first conversation appearing in the affidavit between (Sonny) Armocida and Gazal was as follows:
 SONNY: Hello.
 GAZAL: Sonny?
 SONNY: Yeah?
 GAZAL: Yeah, you said to call you.
 SONNY: Yea.
 GAZAL: Alright?
 SONNY: Okay.
 GAZAL: I was talking to the shoe salesman, and he said he's going to give that guy a call today. He was waiting to hear from him, you know.
 SONNY: Yeah.
 GAZAL: He said I think I'll I better give him a call. Okay?
 SONNY: Yeah, I'll call that kid.
 GAZAL: Okay.
 SONNY: Alright.
 Affidavit of James P. Greene, supra note 6, at 7.
 
 
 [15]
 An excerpt of the second conversation between (Sonny) Armocida and Gazal appearing in the affidavit was as follows:
 GAZAL: Heard from the one guy. He was away. Did you see the salesman?
 SONNY: Yea, I talked to him, ah, he called the guy from you know down there.
 GAZAL: Yea.
 SONNY: The guy told him there was a delay. He said he'll stop over his house Sunday. I said . . . that's liable to be ah, you know, mess us up.
 GAZAL: Yea.
 SONNY: So he said, "well" he said "I'll just have to try to get on him" he said, but ah, the way he sounded he's just coming over Sunday to talk.
 GAZAL: He's just coming to talk?
 SONNY: Yea, so I didn't bother calling that guy down below, I figured I . . .
 GAZAL: Ah what's the use.
 SONNY: No.
 GAZAL: No, it's no good now ah, I'll talk to you after a while.
 SONNY: Alright, I'll be here. I ain't goin' nowhere.
 Affidavit of James P. Greene, supra note 6, at 7-8.
 
 
 [16]
 The district court judge who issued the wiretap order was not the district court judge who heard the motion to suppress the wiretap evidence
 16a See supra note 13.
 
 
 [17]
 Unlike the Fifth Circuit's standard, see United States v. Thomas, 489 F.2d 664 (1973) and our discussion infra, under the Seventh and Eighth Circuits' standard, completely innocent misrepresentation even if material, would not support suppression. See, e. g., United States v. Marihart, 492 F.2d at 900 n. 4
 
 
 [18]
 Affidavit of James P. Greene, supra note 6, at 6
 
 
 [19]
 As noted, see supra note 1, appellant Joseph does not urge that wiretap evidence against him be suppressed. Accordingly, our discussion of minimization has no direct bearing upon Joseph's appeal
 Appellant Conti does not raise on appeal the question of minimizing interceptions of conversations over his telephone. At the suppression hearing below, Conti argued that all conversations involving gambling transactions should have been terminated as such calls were not listed in the authorizing order. Failure to terminate these calls, Conti argued, constituted failure to minimize. The district court properly denied suppression of the wiretap evidence on this ground. Inasmuch as this issue is not before us on the Conti appeal, we need not decide whether the conversations relating to gambling were "innocent" within the context of minimization for a narcotics-directed wiretap. Nevertheless, we are satisfied under the circumstances here that the interception of gambling conversations did not infect the otherwise reasonable character of the interception. Cf. United States v. Rizzo, 492 F.2d 443 (2d Cir.), cert. denied, 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).
 
 
 [20]
 18 U.S.C. § 2518(5) in pertinent part provides:
 Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed . . . in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter.
 A provision of this nature was included in each of the wiretap orders authorized by the district court.
 
 
 [21]
 Conti has not raised the issue of minimization on appeal. See note 19 supra. However, we set forth statistics in regard to the Conti wiretap to provide a more complete picture of the government's monitoring activity during this investigation
 
 
 [22]
 See note 12, supra
 
 
 [23]
 18 U.S.C. § 2518(6) provides:
 Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require.
 
 
 [24]
 Prior to signing the written authorization order, the district judge gave oral directions to the government agents, in part stating:
 "(B)ut the listening, to the particular conversation must stop if somebody is on the line aside from Armacito (sic) or Conti. . . . I do not mean to authorize the interception of Armacito's (sic) wife, if he has one or children or anybody like that. . . ."
 Transcript of Application of the United States for an Order Authorizing the Interception of Wire Communications, at 6 (Sept. 19, 1972). Later in his instructions, the judge apparently inconsistently, stated:
 "I do not mean by that that the interception is to terminate if that conversation is determined and also if the main party in the conversation is not or it is an innocent conversation then you should cease intercepting that particular call."
 Id. at 6-7.
 24a The government contended that the reference to "that guy" was a reference to Elias Zeaiter.
 
 
 [25]
 Clark testified that the defendants agreed that if the informant's identity could be determined, "he should be eliminated." There can be no question that if the defendants so agreed during the course of the conspiracy, such statement would also have been made in furtherance of the conspiracy. See Tr. 4028
 
 
 [26]
 The trial court instructed the jury:
 "The law is that an accomplice's testimony must be received with caution and weighed with care. The testimony of an accomplice is not to be rejected unless the Jury thinks it has no weight whatever. Like any other testimony, it is to be taken and dealt with by the Jury as any other fact is considered or any other evidence is considered.
 Sometimes, if an accomplice's testimony cannot be heard and could not be used, there might be evidence of guilt which would not be available, and therefore, an accomplice may testify, but the testimony of an accomplice, I repeat, should be received with caution and weighed with care. However, it is the law that a person, a defendant, may be convicted on these (sic) uncorroborated testimony of an accomplice, if the Jury finds that the testimony is trustworthy and true."
 Tr. 5683 (emphasis supplied). The portion of the quoted instruction complained of is emphasized.
 
 
 [27]
 The trial itself was not held in Beaver County