**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4910**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

FRANK MARFO,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge. (1:11-cr-00657-MJG-3)

Argued: March 19, 2014                    Decided: May 23, 2014

Before NIEMEYER and AGEE, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Kenneth Everett McPherson, KENNETH E. MCPHERSON, CHTD., Riverdale, Maryland, for Appellant. John Francis Purcell, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Gregory W. Gardner, LAW OFFICES OF GREGORY W. GARDNER, PLLC, Washington, D.C., for Appellant. Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Frank Marfo ("Marfo") appeals his convictions for murder for hire, bank fraud, conspiracy, and other offenses, alleging multiple evidentiary errors stemming from his trial. For the reasons that follow, we affirm.

I.

From May 2009 through November 2011, Marfo participated in a scheme to steal money orders and checks and to defraud banks in Maryland and elsewhere. The scheme involved, first, the theft – principally by Marfo – of money orders and checks from rent deposit boxes located at apartment complexes in Maryland, Virginia, and Delaware. Tavon Davis ("Davis") and Bruce Byrd ("Byrd"), at Marfo's direction, recruited primarily homeless drug addicts to open fraudulent business checking, savings, and payroll accounts at banks in Maryland and New Jersey. These individuals were directed to use their own personal identification, in addition to documents provided by Marfo and Davis, which purported to authenticate the fraudulent businesses under the names that the accounts were being opened. Marfo, Davis, and other members of the fraud conspiracy would alter the payee name of the stolen money orders and checks to correspond to the name of a fraudulent business account, following which they would deposit the stolen money orders and checks into the

2

fraudulent accounts and then withdraw the deposited funds through ATMs and other means. Davis estimated that between $1 million and $1.5 million worth of stolen money orders were deposited and withdrawn from various banks in this manner.

In May 2009, Isaiah Callaway ("Callaway") was recruited by Davis to participate in the bank fraud scheme. Davis and Marfo directed Callaway to open fraudulent bank accounts, deposit stolen money orders into fraudulent accounts, withdraw deposited funds from the fraudulent bank accounts, and recruit and pay individuals to open other fraudulent business accounts.

On December 29, 2010, Callaway was arrested by Baltimore County police while he was in the process of directing two individuals to open fraudulent business accounts at TD Bank and Bank of America. Callaway was charged under Maryland law with possession of counterfeit documents and theft. Following his arrest, Callaway was interviewed by detectives, in the course of which Callaway admitted his participation in the bank fraud scheme, but did not identify anyone in particular.

After Davis and Marfo learned of Callaway's arrest, Davis met with Callaway immediately upon his pre-trial release on the Maryland fraud charges. In January 2011, Davis referred Callaway to Larry Feldman ("Feldman"), a Baltimore attorney, to represent Callaway in relation to those charges.

3

In March 2011, U.S. Postal Inspector Monifa Hamilton ("Inspector Hamilton"), who had been investigating the deposit of stolen and altered money orders into fictitious business accounts at banks in Maryland and Virginia, contacted Feldman and informed him that federal law enforcement officials were interested in interviewing Callaway about the bank fraud scheme. In April 2011, Assistant United States Attorney Tamara Fine ("AUSA Fine") for the District of Maryland, who was assisting federal law enforcement officers in their investigation of the bank fraud scheme, informed Feldman that she and federal law enforcement officials wished to interview Callaway in order to obtain information about the scheme, including the identity of other participants. That same day, Feldman contacted Davis and informed him that a federal prosecutor and law enforcement officials were seeking to interview Callaway about the bank fraud scheme.

Between April 5, 2011, and April 11, 2011, Davis, Byrd, and Marfo communicated and met several times to discuss the threat to the fraud scheme posed by the arrest and possible cooperation of Callaway. They also discussed the murder for hire of Callaway by Byrd in order to prevent Callaway from providing federal law enforcement officers with information about the scheme. On April 11, 2011, Callaway was found dead in a car in Baltimore having been shot multiple times in the head.

4

In May 2011, Michael Copeland ("Copeland"), accompanied by his attorney, came forward with information about the murder of Callaway. Copeland, also involved in the bank fraud scheme, explained that Callaway had been murdered by an unknown triggerman hired by Davis and Marfo for the purpose of preventing Callaway from identifying Davis and Marfo to federal authorities in connection with the scheme. It was at this meeting with federal investigators that Copeland agreed to allow his future meetings with Davis to be videotaped and recorded.

During the course of these recorded meetings between May 2011 and October 2011, Davis made several statements incriminating himself in the bank fraud scheme and the murder. Davis told Copeland that if he were to be arrested, he would admit the bank fraud but deny the murder. Davis also told Copeland that he was not concerned that either the triggerman or Marfo would testify against him for the murder because they were "just as involved as he was. It wouldn't behoove them at all." (J.A. 409.) Davis also described the fraud scheme in detail, including an account of trips he and Marfo made to steal money orders at apartment complexes in several states. (J.A. 409–11.)

Davis was arrested on November 9, 2011, and was immediately permitted to meet privately with appointed counsel. He agreed to cooperate and admitted his role in the murder of Callaway. Davis implicated Marfo in the murder and identified Byrd as the

5

triggerman, stating that Byrd was paid $2,000, to which Davis and Marfo contributed equally. Under agent supervision, Davis arranged a recorded meeting with Byrd later that day, following which Byrd was arrested.

From jail, and under the supervision of investigators, Davis continued to have contact with Marfo. During their recorded conversations, Marfo revealed that he was still involved in the bank fraud scheme. Investigators directed Davis to tell Marfo that he had someone who could meet with Marfo and deposit stolen money orders – an undercover agent. The resulting operation led to Marfo's arrest on February 13, 2012.

On February 23, 2012, a grand jury sitting in the District of Maryland returned a seven-count Superseding Indictment against Marfo, Davis, and Byrd, charging (1) conspiracy to use interstate communication facilities in the commission of murder for hire, resulting in the death of Callaway, in violation of 18 U.S.C. § 1958(a); (2) use of interstate communication facilities in the commission of murder for hire resulting in the death of Callaway, in violation of 18 U.S.C. § 1948(a); (3) conspiracy to murder a witness resulting in the death of Callaway, in violation of 18 U.S.C. § 1512(a)(1)(C); (4) murder of a witness resulting in the death of Callaway, in violation of 18 U.S.C. § 1512(a)(1)(C); (5) use and discharge of a firearm during and in relation to crimes of violence, in violation of 18 U.S.C.

6

§ 924(c); (6) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; and (7) attempted bank fraud, in violation of 18 U.S.C. § 1349. Prior to trial, Davis and Byrd entered guilty pleas on certain counts pursuant to separate plea agreements that provided leniency at sentencing in exchange for testimony on behalf of the Government in the trial against Marfo.

A jury returned guilty verdicts against him on all counts and the district court imposed concurrent sentences of life imprisonment on four counts, a consecutive sentence of 120 months on another count, and concurrent sentences of 57 months on two counts.

Marfo timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

II.

A.

Marfo raises eight issues on appeal, contending that the district court erred by (1) permitting Davis' attorney, Murphy, to testify pursuant to Federal Rule of Evidence 801(d)(1)(B) as to prior consistent statements made to him by Davis implicating Marfo in the Callaway murder; (2) permitting Murphy to testify during re-examination that he had told Davis that the prosecutor was "tough but fair"; (3) commenting on the weight of the evidence; (4) allowing testimony concerning several prior acts

7

and statements by Marfo, in violation of Federal Rule of Evidence 404(b); (5) allegedly allowing the Government to disparage defense counsel; (6) directing the jury to reach a unanimous verdict; (7) instructing the jury that it could infer consciousness of guilt from Marfo's false alibi; and (8) failing to instruct the jury that it could acquit Marfo based on accomplice testimony.

Marfo concedes that he did not object in the district court to any of the items he now claims are error (except one statement in issue five above). Our review is thus for plain error. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732 (1993); United States v. Hastings, 134 F.3d 235, 239 (4th Cir. 1998). "In order to establish our authority to notice an error not preserved by a timely objection, [Marfo] must show that an error occurred, that the error was plain, and that the error affected his substantial rights." Hastings, 134 F.3d at 239; see also Olano, 507 U.S. at 732. Even if Marfo can satisfy these requirements, correction of the error remains within our sound discretion, which we "should not exercise . . . unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732 (internal quotations and alteration omitted). On the single occasion that Marfo raised an objection below, we review the

district court's evidentiary rulings for an abuse of discretion. United States v. Delfino, 510 F.3d 468, 470 (4th Cir. 2007).

We address each of Marfo's claims in turn.

1.

Marfo first contends that the district court erred in permitting Davis' attorney, Murphy, to testify pursuant to Federal Rule of Evidence 801(d)(1)(B) as to prior consistent statements made to him by Davis implicating Marfo in the Callaway murder.

Under Rule 801(d)(1)(B), a prior consistent statement of a person who has testified and been subject to cross-examination is not hearsay and is admissible when the statement is offered to "rebut an express or implied charge against him of recent fabrication, improper influence or motive." United States v. Hedgepeth, 418 F.3d 411, 422 (4th Cir. 2005). A prior consistent statement is admissible under Rule 801(d)(1)(B) as substantive evidence if the statement was made before the declarant had a motive to falsify. United States v. Henderson, 717 F.2d 135, 138 (4th Cir. 1983).

We find that the district court did not err, let alone plainly err, as Davis's prior consistent statements were offered in response to accusations of improper motive and recent fabrication. Callaway was murdered on April 11, 2011. By May

9

22, 2011, Copeland had presented himself to investigators and was recording meetings with Davis, who Copeland implicated in the Callaway murder along with Marfo. Davis' recorded statements made it clear that he was worried he would ultimately be charged for the bank fraud scheme, Callaway's murder, or both. On October 14, 2011, Copeland recorded a conversation with Davis after Davis met with Murphy. Davis's description of the meeting revealed that he had been very frank with Murphy because Davis wanted a professional assessment of what he was facing if prosecuted for either the bank fraud scheme or the murder.

After Davis was arrested on November 9, 2011, and agreed to cooperate, investigators eventually learned that in his October 2011 meetings with attorney Murphy, Davis implicated Marfo in the Callaway murder. Prior to trial, Davis executed a waiver of his attorney-client privilege with Murphy. Following the cross-examination of Davis, in which Marfo's counsel expressly accused Davis of fabricating the testimony implicating Marfo in the Callaway murder for the purpose of receiving a reduced sentence, the Government called Murphy to testify as to Davis' prior consistent statements about Marfo's involvement. Indeed, prior to Murphy's testimony, the district court explicitly instructed the jury:

> The defense theory is that speaking to Mr. Murphy was part of Mr. Davis's scheme, they say, to fabricate the allegations against Mr. Marfo.
>
> So when you listen to what Mr. Murphy says, bear that in mind, and you will decide whether it supports Mr. Davis's testimony before you or it doesn't.

(J.A. 433.) Given the cross-examination of Davis and the instruction above, it is clear that Murphy's testimony was offered to rebut accusations of improper motive and recent fabrication.

Moreover, Davis' statements to Murphy were made prior to the existence of any improper bias or motive to fabricate. Davis' meetings with Murphy occurred prior to Davis' arrest. At trial, Murphy was permitted to testify that in their meetings, Davis told him, inter alia, that Marfo was involved in both the fraud and murder; Marfo helped hire and pay for the triggerman; and Davis and Marfo met with the triggerman either shortly before or after the murder occurred.

Davis' statements were not made to a law enforcement officer, but rather to his own attorney, a confidante with whom his communications were protected by the attorney-client privilege. That Davis' statements preceded a motive to fabricate is further evidenced by his admission of his own culpability in the murder, as well as his failure to incriminate Marfo to a greater extent than he incriminated himself, and by

11

his failure to incriminate Copeland at all. As the prior consistent statements were properly admitted pursuant to Rule 801(d)(1)(B), the district court did not err.

2.

Marfo next contends that the district court erred by permitting Murphy to testify during re-direct examination that he had told Davis that Government counsel was "tough[] but fair." (J.A. 494.) We reject Marfo's contention, as he makes his claim out of context. The challenged testimony was in response to defense counsel's cross-examination of Murphy, regarding what Murphy had told Davis in their meeting, during which defense counsel painted the following portrait of the prosecutor:

> **[Defense counsel]:** [Government counsel is] [k]ind of like a terrier, when it gets ahold of your pants, it won't let go.
>
> **[Government]:** Objection. . . .
>
> **[Murphy]:** I don't know that I told him that. I told him [being prosecuted by the AUSA] wasn't a good sign for him, right. . . .
>
> **[Defense counsel]:** Fair enough. Bottom line, [being prosecuted by the AUSA] wasn't a good sign for Tavon Davis.

(J.A. 468-69.) In response, during its re-direct examination of Murphy, the Government completed the account of what Murphy told Davis:

**[Government]:** Now you testified before about some discussions you had with Mr. Davis about my co-counsel, Mr. Purcell; is that right?

**[Murphy]:** Yes.

**[Government]:** Do you remember saying anything to Mr. Davis about whether or not Mr. Purcell is fair?

**[Murphy]:** Yes, I do. I told him he was tough, but fair. . . . [Davis] asked me about his integrity, and I told him that it was my experience that [the AUSA] was an honest prosecutor.

(J.A. 493-94.) Even assuming, <u>arguendo</u>, that the district court erred by allowing this testimony, to which Marfo failed to object, Marfo has not demonstrated that this presumed error affected his substantial rights by causing him actual prejudice. See <u>Hastings</u>, 134 at 244 n.8 (4th Cir. 1998) ("On review for plain error, the defendant bears the burden of establishing that he has been prejudiced by an unpreserved error."). To meet this standard, Marfo must demonstrate that the presumed error "resulted in his conviction." <u>Id.</u> Marfo has not satisfied his burden because the factual evidence against him overwhelmingly supports his conviction. The district court thus did not err in permitting the re-direct examination of Murphy.

Marfo also contends that the district court erred by commenting on the weight of the evidence; specifically, by instructing the jury as to the Government's presentation of circumstantial evidence. Marfo alleges that the error was contained in the following instruction:

> The government has the burden of proof, as I said, beyond a reasonable doubt. Proof can be done in two ways. One is direct evidence, and that is there's evidence, people who say I saw this happen, I heard these words spoke, things like that.
>
> Then there can be circumstantial evidence, and there is plenty of that. People will say well, I saw A happen, and each side says well, if you find that A happened, you should find that B is true, and the other side will say, but you can find that C is true. In short, circumstantial evidence is good evidence, as good as you determine it should be under the circumstances.

(J.A. 613-14.) Marfo, overlooking context, contends that the district court, by including the phrase "and there was plenty of that" in its instruction, basically conveyed to the jury its opinion on the weight of the evidence. We find, however, that the phrase – which followed the court's description of several examples of direct evidence – similarly indicated that circumstantial evidence, like direct evidence, can take many, or "plenty," of forms.

Nor is there any support in the record for Marfo's contention that the district court improperly "quantified" the amount of circumstantial evidence, or that it placed its "'controlling' stamp of approval on the government's case." (Appellant's Br. 41, 43.) When reviewing jury instructions, we do not "view a single instruction in isolation," but rather, "view an allegedly erroneous instruction in its full context." United States v. Tillery, 702 F.3d 170, 176 (4th Cir. 2012). Here, the complete record reveals that the district court instructed the jury accordingly: "I have not, during the course of this trial, suggested what your verdict should be on any of these charges. I won't. If you think I did, I haven't done right, and you should disregard it anyway." (J.A. 608–09.) The district court, therefore, appropriately emphasized its impartiality. Accordingly, we find that the district court did not err.

4.

Marfo next contends that the district court erred by allowing testimony concerning several prior acts and statements by Marfo. He alleges that the district court erred by admitting evidence, without objection, of what he now characterizes as "bad act" evidence, in violation of Federal Rule of Evidence 404(b), specifically (a) his use of marijuana and destruction of

15

evidence of marijuana possession; (b) his prior heroin dealing; (c) his threat to kill a female witness in a previous case and another witness in this case, Copeland; (d) his assault of a co-conspirator; and (e) his participation in a theft scheme at a local mall.

Under Rule 404(b), a party is not permitted to present evidence of an accused's prior crimes, wrongs, or bad acts when offered to prove character. However, acts that are intrinsic to the crime are not barred by Rule 404(b) where "inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996); see also United States v. Powers, 59 F.3d 1460, 1464–65 (4th Cir. 1995) (evidence pertaining to chain of events explaining context, motive, and set-up of crime is properly admitted if it forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime); United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994) (evidence of other crimes or uncharged conduct "is not considered 'other crimes'" for Rule 404(b) purposes if it arose out of the same series of the transactions as charged offense, or if necessary to complete story of crime on trial). In such situations, we need not engage in a Rule 404(b) analysis. See

16

United States v. McBride, 676 F.3d 385, 396 (4th Cir. 2012) (four-part test).

With these principles in mind, we address each item Marfo contends transgressed Rule 404(b) and therefore should not have been permitted into evidence.

### a. Marijuana Possession and Destruction

At trial, Davis and James Pearson ("Pearson") testified that on July 29, 2011, Marfo was driving them to New Jersey for the purpose of having Pearson open fraudulent bank accounts when they were stopped for speeding. At the time of the stop, Marfo was smoking marijuana, which he swallowed to avoid arrest. Marfo contends that the district court's admission of Davis and Pearson's testimony – that he possessed marijuana and destroyed evidence of such – violated Rule 404(b) and constitutes prejudicial plain error.

We find that the district court did not err in admitting this evidence because it was intrinsic to the commission of an act in furtherance of the ongoing bank fraud scheme. The trip to New Jersey to open additional fraudulent bank accounts, as well as Marfo's actions when confronted by the possibility of arrest, was intrinsic evidence because those acts "arose out of the same series of transactions as the charged offense, [and] . . . were necessary to complete the story of the crime on trial."

17

United States v. Basham, 561 F.3d 302, 327 (4th Cir. 2009) (admission of evidence relating to defendant's prior drug use and sexual relationships was proper under Rule 404(b) to complete the story of the crime and to put relationships of parties in context). The evidence was also relevant to establishing the continuing relationship between Marfo and Davis after Callaway's murder, and was thus probative of Marfo's motive and participation in the murder conspiracy; after all, protecting Marfo's scheme was the motive for the murder. See United States v. Smith, 441 F.3d 254, 262 (4th Cir. 2006) ("Evidence is necessary, even if it does not relate to an element of a charged offense, when it furnishes part of the context of the crime." (quotation marks omitted)).

Evidence of Marfo's marijuana possession was also intrinsic to his use and possession of marijuana as a recruiting tool and method of payment in the bank fraud scheme. At trial, Andrew Styron ("Styron") testified that Marfo recruited him to cash stolen money orders, open fraudulent accounts, and recruit others to do the same; that Marfo supplied marijuana to Styron's friends as a way of forming relationships that led him to deposit stolen money orders or open fraudulent accounts for him; and that Marfo sometimes paid Styron with marijuana to drive him to apartment complexes in order to steal money orders. The evidence was further relevant to Pearson's identification of

18

Marfo as the one who recruited him in relation to the bank fraud scheme.

In any event, the challenged evidence would have satisfied Rule 404(b). That Marfo continued his involvement in the fraud scheme with Davis after Callaway's murder was powerful evidence of his motive and participation in the murder scheme. Marfo's challenge of Pearson's identification of him also made evidence supporting that identification that much more relevant and necessary. See United States v. Byers, 649 F.3d 197, 206 (4th Cir. 2011) (cross-examination of government witnesses created a significant credibility issue). The district court thus did not err in admitting this evidence.

### b. Prior Heroin Dealing

Marfo next contends that the district court erred by allowing Davis to testify that he and Copeland distributed heroin through a certain individual identified as "Kofi" (who introduced Marfo to Davis in 2008), and that from time to time, Davis distributed heroin to Marfo. On cross-examination, Marfo's counsel questioned Davis extensively about Davis', Copeland's, and Byrd's involvement in the Callaway murder, as the defense sought to contrast those individuals' arguably greater degree of involvement in the murder with Marfo's ostensibly lesser role. Marfo also sought to show that Davis'

19

close relationship with Copeland resulted in bias against Marfo, so that when Davis decided to cooperate, he falsely implicated Marfo in the murder. Indeed, showing that Davis was biased against Marfo was a central theme of the defense. Accordingly, the Government's decision to present evidence showing that Davis and Marfo were also involved in crimes, such as the heroin sales, tended to show that Davis' relationship with Copeland was not so unique. Thus, on re-direct examination, the Government asked a single question of Davis, in response to which Davis confirmed that he had a heroin source, that he had sold to Copeland, and that on occasion, he has sold to Marfo.

Marfo contends that the Government "only introduced evidence of [his] participation in heroin distribution to show that [he] had a propensity to join conspiracies with the same men." (Appellant's Br. 55.) To the contrary, we find that the limited testimony about how Davis met Marfo through Kofi (Davis' drug connection) was probative of the very formation of the conspiracy between Davis and Marfo. See Kennedy, 32 F.3d at 885 ("Evidence of uncharged conduct is not considered 'other crimes' evidence if it arose out of the same series of transactions as the charged offense, or if it is necessary to complete the story of the crime on trial." (quotation marks and alterations omitted)).

Even if considered to be a "bad act" under Rule 404(b), this evidence was relevant and necessary in establishing the context of the relationship between Davis and Marfo, which the jury necessarily had to consider in deciding whether Davis falsely implicated Marfo. The testimony told the "story" of how and why Davis met Marfo and whether Davis' relationship with Marfo affected his credibility. As the Government may "provide context relevant to the criminal charges," we find that the district court did not err in admitting this evidence. United States v. Cooper, 482 F.3d 658, 663 (4th Cir. 2007).

### c. Threat to Kill Witnesses

Marfo next contends that the district court erred by admitting a recorded statement by him to Davis on January 12, 2012, that Marfo would "tak[e] care" of and "pop" Copeland when things "cool[ed] down." (J.A. 275-79.) Marfo also stated, "I'll let him have it, yo, for real," which Davis understood to mean that Marfo would murder Copeland. (J.A. 279.)

Marfo also asserts that the district court erred by admitting a statement he made to Davis – while they were planning the murder of Callaway – that Marfo wished he had murdered a female witness in a Baltimore County theft case that

21

resulted from a December 2009 arrest.[1]  Davis testified that while he and Marfo were planning to murder Callaway, Marfo referred to the state prosecution, stating that he wished he had killed a female witness in that case.  This conversation necessarily occurred between December 2010 – when Callaway was arrested – and April 11, 2011, when Callaway was murdered. Davis testified that at the time of this conversation, Marfo had just "gone through" the state prosecution (for which he was still on probation at the time of the Callaway murder), and that Marfo did not want to go through that again.  (J.A. 185.)  Davis stated that, "[n]ow facing it again, [Marfo] wished he had killed the witness [a woman whose name Davis did not recall] for the other case."  (J.A. 185.)

Marfo does not dispute that he made these statements. Instead, he claims that the statement that he wished he had killed the female witness in the state theft case was admitted solely as propensity evidence, in violation of Rule 404(b)(1).

---

[1]  In December 2009, Marfo and Styron were charged in Baltimore County, Maryland, with the theft of money orders from rent deposit boxes and related charges.  Styron identified several individuals, including a woman, whom he and Marfo recruited to deposit or cash stolen money orders.  These individuals were also identified in police reports written by the Baltimore County police detectives who investigated and arrested Marfo and Styron in December 2009.  The state charges were disposed of in October 2010, and Styron was sentenced to six months' imprisonment.  Marfo received a suspended sentence.

As to his recorded statement to Davis on January 12, 2012, Marfo contends that also was only propensity evidence "to show that Marfo is the type of bad guy who would kill a witness," and that such evidence had no relevance to Callaway's murder. (Appellant's Br. 56.)

We find, however, that both of these statements were intrinsic to the "story" at trial. Marfo made both statements during the fraud conspiracy and the murder conspiracy, and evidence of Marfo's participation in the former was probative of his motive and intent to participate in the latter. See Chin, 83 F.3d at 88 ("Other criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." (quotation marks omitted)). Both statements were probative of the existence of the ongoing fraud conspiracy and of Marfo's motive and intent to murder Callaway to preserve that ongoing fraud scheme. Marfo's threats and statement of intent to kill witnesses in the same case in which he was charged were intrinsic evidence of consciousness of guilt.

Moreover, although unnecessary, this evidence could have been properly admitted under Rule 404(b). We have allowed evidence of prior threats against witnesses in unrelated cases as consciousness-of-guilt evidence under Rule 404. See, e.g.,

United States v. Higgs, 353 F.3d 281, 312 (4th Cir. 2003); United States v. Queen, 132 F.3d 991, 993-94 (4th Cir. 1997) (affirming admission of evidence in witness tampering case that defendant had intimidated two witnesses in unrelated, earlier prosecution); Basham, 561 F.3d at 328 (statements by defendant charged with carjacking that he was willing to kill in an unrelated matter were "highly probative" of his specific intent to cause serious harm in carjacking). As the evidence was intrinsic and would have been properly admitted under Rule 404(b), we find that the district court did not err.

### d. Assault of Co-Conspirator Pearson

Marfo also contends that the district court erred by admitting the testimony of Pearson, in which Pearson described being assaulted and threatened by Marfo in the presence of Davis after Marfo discovered that Pearson had withdrawn money from one of the fraudulent bank accounts. As described by Pearson, the assault occurred after the July 29, 2011 trip to New Jersey, and was Pearson's last contact with Marfo. Davis corroborated Pearson's account, stating, "We [Marfo and I] confronted him [Pearson] about the money that was missing out of the account. Frank [Marfo] beat him up a little bit." (J.A. 90.)

Marfo asserts that admitting testimony concerning the assault amounts to plain error because the evidence was admitted

24

solely for the purpose of showing that Marfo was a violent person. As with Pearson's trip to New Jersey, however, we find that the evidence of Marfo's assault was intrinsic to the charged crimes. The assault – which was committed in retaliation for Pearson's theft of money from a fraudulent account into which Marfo's stolen money orders were deposited – was an act in furtherance of the ongoing bank fraud conspiracy. It was thus intertwined with the conspiracy to murder Callaway, the sole purpose of which was to ensure the survival of the bank fraud scheme. Because describing the assault was necessary to tell the complete story of Marfo's participation in the charged conspiracies, see Basham, 561 F.3d at 327, the district court did not err in admitting Pearson's testimony.

e. Participation in Theft Scheme at Local Mall

Lastly, Marfo contends that the district court "plainly erred when it allowed the government to introduce evidence that Marfo participated in an unrelated theft scheme because it is not probative of anything." (Appellant's Br. 58.) At trial, Styron testified that (apart from smoking marijuana with Marfo) when he met Marfo, he occasionally sold Marfo items of clothing stolen by Styron's friends from a local mall. Styron, however, did not implicate Marfo in the theft of the clothes or even assert that Marfo knew that they were stolen. There was thus no

25

"bad act" attributed to Marfo beyond buying clothes from Styron, which, by itself, is not a "bad act."

Regardless, we find that Styron's testimony was intrinsic to how Marfo and Styron met and how Marfo recruited Styron into the stolen money order scheme. See Kennedy, 32 F.3d at 885 ("Evidence of uncharged conduct is not considered 'other crimes' evidence if it arose out of the same series of transactions as the charged offense, or if it is necessary to complete the story of the crime on trial." (quotation marks and alterations omitted)). Even if not intrinsic, this evidence would have been properly admitted pursuant to Rule 404(b), as the Government may "provide context relevant to the criminal charges." Cooper, 482 F.3d 658, 663 (4th Cir. 2007). The district court thus did not err.

f.

In sum, Marfo incorrectly argues that the challenged evidence was improperly admitted by the district court in violation of Rule 404(b). To the contrary, in each instance, the purported "bad act" evidence was intrinsic to the crimes charged in the indictment. Accordingly, there was no violation of Rule 404(b), and thus no error – let alone plain error – by the district court.

Marfo next contends that the district court erred by allegedly allowing the Government to disparage defense counsel. Specifically, Marfo claims that the district court erred "when it did not instruct the jury following a remark [by the prosecutor] disparaging Marfo's attorney's objections." (Appellant's Br. 62.) The remark in question occurred near the end of Copeland's direct examination, when Copeland had just confirmed that he was represented by counsel:

> **[Government]:** You have been advised by counsel throughout; is that right?
>
> **[Copeland]:** Yes.
>
> **[Government]:** And continue to be?
>
> **[Marfo's Counsel]:** Objection, objection.
>
> **[The Court]:** What's the objection?
>
> **[Government]:** It is [that the above was] continuing to be an egregious leading question. Please.
>
> **[The Court]:** I don't remember the last question as leading.
>
> **[Government]:** I asked if he was represented. He said yes, at the time of the grand jury. And I said and [you] continue to be? Now, Your Honor, if that's a leading question, fine.
>
> **[The Court]:** He is still represented by Mr. White, I assume.
>
> **[Government]:** Yes.

27

**[The Court]:** Okay.

**[Government (to Marfo's Counsel)]:** <u>Let's have important objections, if you can think of one</u>.

**[Marfo's Counsel]:** Judge, Judge, you're not hearing his comments, but they are continuing. You know, that's ok.

**[Government (to Copeland)]:** You were represented; is that right?

**[The Court]:** I'm glad you think it was an important objection, and we can now move on. Okay.

**[Government (to Copeland)]:** And you continue to be represented.

**[The Court]:** If he didn't think it was an important objection, Mr. Purcell [Government], I probably wouldn't pay any attention to it. But perhaps I should make my own judgment from now [on]. So go ahead and ask your next question.

(J.A. 407–08 (emphasis added).) The phrase, "Let's have important objections, if you can think of one," is the remark which Marfo contends was disparaging and denigrated his counsel in the eyes of the jury. Although it could be characterized as exasperated and perhaps rude, we find that the remark was not necessarily denigrating, and certainly does not rise to the level of plain error on the part of the district court by not "following up" with a <u>sua</u> <u>sponte</u> instruction about the propriety of objections. Conversely, the district court instructed the jury several times that it was the duty of counsel to object.

28

Marfo also overlooks the fact that the district court explicitly instructed the jury as follows: "I can simply say that nobody here is trying to hide anything from you.  No lawyer has acted in a way that is, in my judgment, at all improper."  (J.A. 613.) Marfo has shown no prejudice, nor has he provided any basis for us to find and take notice of plain error by the district court.

Marfo also contends that it was improper for the Government to point out, in rebuttal closing argument, that when Marfo's counsel argued Davis was untruthful, he failed to explain or refer to portions of Davis' testimony in which Davis seemed to truthfully describe the extent of his involvement in the murder and described Marfo as being comparatively less involved in certain facets.[2]  The Government observed:

> **Government:** But there's a reason he didn't say anything about why Davis did not implicate Copeland.  Easiest thing in the world, easiest thing in the world.  You know why?  Because [Davis] was telling the truth. And you know why he was telling the truth? You saw Mr. Davis going through – he was on the stand for three days. . . .
>
> But you saw – and one of the points of credibility that the judge advised you about is watching a man, watching a witness on direct and then watching the way they are acting, what they are saying on cross-

---

[2]  Marfo's objection during the Government's rebuttal argument to a comment on Marfo's counsel's failure to address certain aspects of Davis's testimony is reviewed for an abuse of discretion.  See Delfino, 510 F.3d at 470.

examination.  Davis was correcting counsel. He was minimizing Marfo's role when it was truthful to do so.

I asked him about 50 times pointed questions, did Marfo do that?  No.  Did Marfo do that?  No.  Did Marfo do this?  No. Is [Davis] a liar, trying to get bonus points from the government?  Answer that question.  Counsel [Marfo's] didn't bring that up, and he's not going to.  He's not paid to do that.  He's paid to dance–

**Defense counsel:** Objection.

**Government:** –yell, and sit down.

**Defense counsel:** Objection to that.

**The Court:** Let him make his argument.

**Government:** [Davis] . . . had three days of opportunity to tell you that Copeland was involved. . . .  But you know, he didn't break.  Davis didn't break.  He corrected counsel.  He corrected me.  [Davis] minimized Marfo's role, when appropriate, and he did that because [Davis] was broken long before he got in here.

(Dist. Ct. Trial Tr. Closing Arguments 92–93 (Day 8).)

We find that the district court correctly perceived the Government's remarks to be a comment on the failure of defense counsel to discuss the evidence, which is permissible.  See Lockett v. Ohio, 438 U.S. 586, 596 (1978) (prosecutor's comments regarding "uncontradicted" evidence did not violate Constitution when merely responsive to defendant's failure to produce defense asserted during opening statement).

30

Most significantly, Marfo is unable to demonstrate that the Government's remarks were improper. To reverse a defendant's conviction due to a prosecutor's improper remarks, we must find that (1) the remarks were improper; and (2) they so prejudiced the defendant's substantial rights that the defendant was denied a fair trial. See United States v. Powell, 680 F.3d 350, 358 (4th Cir. 2012) (prosecutor's referral to defendant as liar was not clearly improper).

Here, the Government's remarks did not tend to mislead the jury because they merely highlighted defense counsel's selective argument about Davis' credibility. The remarks to which Marfo objects were isolated, and most importantly, the strength of the evidence to establish Marfo's guilt remains unchallenged. Even if we assume error, it was harmless and could not reasonably have affected the outcome of the trial, particularly given how much evidence was presented about Davis' credibility. At worst, the Government's remark on defense counsel's failure to address aspects of Davis' testimony "represents the sort of thrust and parry in which attorneys typically engage in the course of their last chance to persuade a jury." United States v. Runyon, 707 F.3d 475, 513 (4th Cir. 2013). Accordingly, we find that the district court neither erred nor abused its discretion by allegedly permitting the Government to disparage Marfo's counsel.

31

6.

Marfo also contends that the district court erred by directing the jury to reach a unanimous verdict. Marfo claims that the following portion of the district court's jury instructions, given before closing arguments, constituted plain error because it "told [the jurors] that they needed to reach a verdict." (Appellant's Br. 66.)

> The third reason to listen extra hard is the critical thing, and what we're all about, and that is what do we owe them? We owe them a verdict that you have reached, and the party that didn't get the verdict that they want can know for sure, I'm sorry, I really listened to both sides of the case, and I just decided this way.

(J.A. 636.) Marfo, again, makes his claim out of context. As discussed above, a district court's instructions must be considered in their entirety. See Tillery, 702 F.3d at 176. Here, the entirety of the instructions reveals that the challenged instruction represented the third of three reasons the district court gave to the jury as to why its members should listen critically to the closing arguments. Indeed, the court had explicitly told the jury, "We don't owe them the verdict that they want. We can't give everybody the verdict that they want." (J.A. 635 (emphasis added).)

32

The district court also repeatedly expressed deference to the judgment of the individual jurors and asked no more than that they consider each others' views:

> It is important to attempt to reach a unanimous verdict, but only if each of you agree, after making your own conscientious decision. As we say, don't change an honest belief about the weight and effect of the evidence just to reach a verdict.

(J.A. 651–52.) A review of the district court's instructions, in their entirety, belies Marfo's contention that the court improperly directed the jury to reach a unanimous verdict without "room for disagreement." (Appellant's Br. 66.) Accordingly, the district court did not err.

7.

Marfo further contends that the district court erred by instructing the jury that it could infer consciousness of guilt from Marfo's false alibi. The district court instructed the jury that an exculpatory statement made by a defendant and found to be untrue could be considered evidence of a defendant's consciousness of guilt:

> You have heard testimony that the defendant made statements out of the courtroom to law enforcement officials in which the defendant claimed he was not present at the scene of certain crimes when they were committed. The government claims that these alibi statements were false.

33

> If you find that the defendant intentionally gave a false statement in order to mislead the investigating authorities that he was not present at the scene of the crime, you may, but need not, infer that the defendant believed that he was guilty. You may not, however, infer on the basis of this alone that the defendant is in fact guilty of the crime for which he is charged.

(J.A. 629-30.) This instruction was based on false exculpatory statements that Marfo made during his post-arrest interview on February 13, 2012. Marfo was asked about the Callaway murder and his relationships with Davis and Byrd, to which Marfo made false exculpatory statements that were contradicted by other evidence in the trial. The false statements included Marfo's claim that he only knew about Davis' involvement in the Callaway murder from reading a newspaper article; that he had no involvement in the murder; that Marfo only knew Byrd from being with Davis for a single meeting with him at a local mall; that Marfo had no knowledge of why Davis and Byrd met; that Marfo had no knowledge that Davis was involved in the murder; that he had no prior knowledge of the murder; and that he had not contributed to the payment for Callaway's murder.

We think that the district court's instruction was proper. It is well-settled that "an exculpatory statement made by a defendant and found to be untrue [can] be considered evidence of a consciousness of guilt." United States v. McDougald, 650 F.2d 532, 533 (4th Cir. 1981). Each of Marfo's false exculpatory

34

statements were contradicted by evidence at trial. Davis implicated Marfo in the murder and testified that Marfo had agreed to the necessity of killing Callaway in order to prevent him from testifying. Davis testified that he and Marfo discussed the murder nearly every day, and that Marfo had agreed that part of the triggerman's payment would come from his share of the fraud deposits. Davis also testified that in response to a call from Byrd, Davis and Marfo met with Byrd because Byrd wanted to make sure that Marfo was "okay." Copeland likewise testified that Davis had told him that Marfo was involved in the murder and had offered to do it himself. Murphy confirmed that Davis told him Marfo, whose name Murphy recalled and had written in his notes, was involved in recruiting and paying the triggerman, Byrd. Further, in a February 9, 2012, recorded conversation with Davis, Marfo acknowledged going to meet Byrd "right before the shit happened." (J.A. 681.) We find that Marfo's statements were "more than general denials of guilt"; these were statements later contradicted by evidence at trial, thereby justifying the district court's instruction on consciousness of guilt by false alibi.

Marfo also contends that an alibi instruction was unnecessary because it is undisputed that he was not present at the actual murder scene. Marfo, however, overlooks that he clearly denied involvement in a murder conspiracy – one of the

35

crimes with which he was charged.  Further, in his post-arrest statement, Marfo falsely exculpated himself from meeting Byrd anywhere but at a local mall, which, as noted, was contradicted by Marfo's own statement on February 9, 2012.

Marfo further contends that the district court's instruction should have included language that his false exculpatory statements "could have been consistent with innocence" because "people accused of serious crimes often try to distance themselves from the criminal activity as much as possible."  (Appellant's Br. 71.)  Marfo, again, overlooks context.  Merely two paragraphs before the above-mentioned instruction, the district court instructed the jury that Marfo's false exculpatory statements could be "consistent with innocence."

> You have heard testimony that the defendant made certain statements outside the courtroom to law enforcement authorities in which he claimed that his conduct was consistent with innocence and not with guilt. The government claims that these statements in which he exonerated or exculpated himself are false.

(J.A. 629 (emphasis added).)  The jury was thus properly instructed as to whether to infer consciousness of guilt from Marfo's post arrest statements.  Accordingly, we find that the district court did not err.

Marfo further contends that the district court erred by failing to instruct the jury that it could acquit Marfo based on accomplice testimony. The court gave the following instruction:

> The government is permitted to enter into [a plea agreement with a witness in exchange for that witness's testimony]. You, in turn, may accept the testimony of such a witness and convict the defendant on the basis of this testimony alone if it convinces you of the defendant's guilt beyond a reasonable doubt.

(J.A. 626–27.) Citing United States v. Armocida, 515 F.2d 29, 48 (3d Cir. 1975), Marfo asserts that the district court erred because it instructed the jury that it could only convict him on the basis of an accomplice's uncorroborated testimony; it did not instruct the jury that it could acquit Marfo on that basis as well.

In Armocida, the defendant and several co-appellants were prosecuted for drug distribution and conspiracy. 512 F.2d at 34. The criminal activity surrounding the charges was extensive and included many accomplices, most of whom accepted plea deals with the government and testified against the defendant. Id. at 47. The district court instructed the jury that it could convict on the basis of an accomplice's uncorroborated testimony, but did not instruct the jury that it could acquit on that basis as well. Id. The Third Circuit determined that the

instruction was erroneous, but in that case, was harmless: "failure to give the 'acquittal' segment of the accomplice instruction could not mislead the jury or 'turn the scale' against the appellants." Id. at 48.

We find that Marfo's reliance on Armocida is misplaced. As discussed above, even the Armocida court found that the claimed error in that case was harmless. Moreover, in the case relied upon in Armocida – Cool v. United States, 409 U.S. 100, 103 n.4 (1972) – the accomplice instruction given by the court was found to be "incomplete" because the accomplice testimony referred to was exculpatory of the defendant. See Armocida, 515 F.2d at 48 ("In Cool, the accomplice testimony controlled the outcome of the trial and was completely exculpatory as to the defendant."). Conversely, in Marfo's trial, there was no exculpatory accomplice testimony that would have warranted the instruction discussed in Cool. See also United States v. Henry, 869 F.2d 595, 1989 WL 14355, at *2 (4th Cir. 1989) (table) (unpublished) (finding that because there was "no [accomplice] evidence which could be called exculpatory as set forth in Cool. . . . [t]he accomplice instruction given by the court was under the particular facts an acceptable expression of applicable law"). Because there was no exculpatory accomplice testimony in this case, we find that the district court did not err by not

instructing the jury that it could acquit Marfo based upon accomplice testimony.

## B.

Finally, Marfo contends that the district court erred based on the cumulative effect of all of the alleged errors. As recounted above, however, no identifiable errors occurred during Marfo's trial. Even if we were to assume any errors, we cannot conclude that the errors prejudiced Marfo's case so as to justify the unusual remedy of reversal based on cumulative error. None of the errors – if assumed – on their own would have caused "any cognizable harm," Basham, 561 F.3d at 330, and the strength of the Government's evidence leaves little doubt that the jury would have returned guilty verdicts irrespective of any identifiable errors.

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.